Good morning, Your Honors. May it please the Court. Lauren Tory on behalf of Appellant Stoney Prior, I'd like to reserve three minutes for rebuttal and I will do my best to watch my time. In this case, there were multiple jury instruction errors and trial errors that violated Mr. Prior's due process rights by hindering his ability to present a complete defense. These errors require reversal. With this Court's permission, I'd like to focus on two issues today. The first is the District Court's denial of Mr. Prior's requested third-party culpability defense instruction. The second is prosecutorial misconduct for allowing the cross-examination of Mr. Prior's expert with facts not in evidence. Turning first to the denial of the third-party instruction, a defendant is entitled to defense theory instruction for a recognized offense that is supported by the evidence. And that's what we have here, Your Honors. The District Court's failure to provide this defense instruction was a due process violation. This Court provides a three-part test in United States v. Thomas for determining whether this is reversible error. And here, the first two parts of that test are undisputed. That is, whether there is some foundation in the evidence and if it's supported by law. The only part of this test that is in dispute as to this issue is the third and final part of this test, which is whether the given instructions adequately encompass the defense theory. Here, the given instructions do not. The jury was never instructed that the third-party culpability defense was a valid defense or how the jury was to handle defense evidence once it was presented. How explicit do the instructions have to be in terms of raising any particular defense theory of reasonable doubt given the general reasonable doubt instruction? It depends on the defense theory. But here, in this case, the reasonable doubt instruction was informed the jury about the government's burden as to the elements themselves. The jury was not informed as to who had the burden of proof when it came to the defense, once defense evidence was presented. Here, a jury who is unschooled in the intricacies of law might have concluded that Mr. Pryor was guilty because he didn't prove his own defense. I guess the question is that for a defense like this, it's one that people can understand. It was somebody else who did it. That was the theory that was presented. The reasonable doubt instruction talks about you have to be firmly convinced that the defendant did it. Why do you think that doesn't allow a reasonable juror to basically vindicate your client's defense if it agrees with it? Because here we have instructions that tell the jury that the government must prove the elements beyond a reasonable doubt. We have instructions, and I'll address also innocence, Your Honor. We have an innocence instruction that discusses the defense or the defendant is innocent and does not need to put forth a defense. We don't have anything in the instructions that tells the jury who has the burden once defense evidence is presented. I would compare this to something like the alibi defense. The alibi defense is in the model instructions. It is useful in instructing the jury that the defendant doesn't have the burden of proving that he was there at the place and time of the crime and that the burden remains with the government, that it must prove beyond a reasonable doubt that he was there at the place and time. But you can see this, your proffered instruction here is not in our model instructions. No, Your Honor, but that doesn't change the court's analysis here. The court has found in United States v. Kaiser that a non-model instruction there that the court still reversed based on failure to provide a defense instruction that was not a model instruction. Why isn't it sufficient for you to bring in that argument at closing, given the general reasonable doubt instruction, which does seem to properly assign the government's ultimate burden? The court holds that the right to a complete defense is empty without an instruction that is sufficient. And so the closing arguments here would not be sufficient to explain what that defense theory is. Here at trial, two things make up the facts at issue, and that is the evidence that is adduced and the instructions that are provided by the court. That comes from Matthews v. United States. Here, Mr. Pryor was only provided half of that. He was allowed to present evidence, but his defense instruction was not permitted to be provided in the instruction packet. That is reversible error. Why don't you address, actually, the sufficiency of the evidence, because I wonder how much some of this instructional error argument depends on the strength of that evidentiary showing in the first place. Of course, Your Honor. Here, that would fall under the first part of the Thomas test, which is there needs to be some foundation in the evidence. But as this court holds in United States v. Johnson, that can be weak, inconsistent, or doubtful evidence. We meet that burden under the test here. Mr. Pryor, and I would also note that the district court agreed, because the district court allowed the evidence to be adduced at trial to put forth this defense. It just didn't permit the defense instruction. Okay. So you think the only issue is did the other instructions adequately cover this? That's correct, Your Honor. The other two parts of the test are undisputed by the government. And I would also note, as to the sufficiency, too, Your Honor, just for completeness, the court has held in Lunbury v. Hornbeak that a confession to a crime does not detract from the prejudice flowing from the defendant's inability to present a defense of third-party culpability. And this court has found that failure to provide defense theory instructions are prejudicial, even in the event of a confession in habeas cases like Bradley v. Duncan. And you want to address the cross-examination of the expert? Yes, Your Honor. The prosecutor here committed misconduct by crossing Dr. Sullivan with facts not in evidence. This court holds that hypotheticals are permissible on cross-examination, but the questions must not require the expert to assume facts that are not in evidence. That's what took place again and again during this cross-examination of Dr. Sullivan. When we look at some of the questions themselves, the prosecutor asked, Doctor, would it change your opinion if you learned that when speaking to investigating agents involved in the case, the defendant stood up and knocked things off a table? Would it change your opinion to learn that when things were being searched, that he became uncompliant with the people searching his things? These were very specific questions that were asked about other acts or negative instances of Mr. Pryor's conduct. Do you contend those were, although I know you say they're not in evidence, but do you contend they're just factually inaccurate or misleading in any way? Your Honor, there's nothing in the record to show, to prove that these did in fact happen. While we aren't necessarily denying them, there's no record evidence to support these facts that were adduced that were not in evidence at the time. Here, these questions themselves materially affected the fairness of this trial because Dr. Sullivan was Mr. Pryor's best evidence of showing that he is a unique individual with a low IQ, someone who has executive functioning deficits, who would be highly suggestible, and why he might falsely confess and continue to falsely confess. I believe the witness continued to testify, held his ground on both of those things, said that no, that wouldn't change my opinion, and then later on made some pretty significant concessions that Mr. Pryor's condition would not necessarily lead to an untrue confession of a double murder. So I'm trying to understand what was the ultimate harm to this defense given that the expert stood his ground? Your Honor, here the harm is that the, and I'll sort of group them into questions about noncompliance, questions about malingering. Here, these questions would have led the jury, or could have led the jury to believe that Dr. Sullivan didn't appropriately attest Mr. Pryor, that Mr. Pryor lied when taking these tests, and that the jury couldn't essentially trust the test results. Here, the issue is with the questions, and while Your Honor has explained the doctor's answers, the problem is that these questions might have led the jury to, it would have damaged Dr. Sullivan's credibility. And so any answer that he would have provided couldn't be cured by these questions that undercut his testing and Mr. Pryor's taking of those tests. You're not suggesting here that there was any taint of propensity evidence in terms of Mr. Pryor's aggressiveness, or tendencies towards violence, you seem to be making an argument mostly that it just undermined your key expert's psychological testimony. It's both, Your Honor, it's both. So as to the noncompliance, the questions about his noncompliance with law enforcement, it could have led a juror to believe that these things actually happened. There was no curative instruction to explain that this was simply offered for impeachment purposes. The jury then could have taken these as fact, and these facts were never placed in evidence. You asked for that curative instruction? It was requested, Your Honor, but the court did not provide it. So here, the best case for this argument, or for this point, is U.S. v. Stinson, and the court is very clear that for experts in particular, the government cannot require the expert to assume facts not in evidence. So here we have an error that was extremely harmful, extremely prejudicial to Mr. Pryor's, again, best evidence of explaining his defense, and why he might lie to protect Kim. What is the government supposed to do in a, you know, you have, the defense puts on an expert, and we'll give you time for rebuttal, so, if the defense puts on an expert, and the government believes, you know, the defense expert is making broad statements that, and didn't consider certain things, are they supposed to basically lay an evidentiary foundation for these points at some prior point before the cross-examination? Yes, Your Honor, that would be appropriate. The government has a few options. It can introduce the evidence. It can lay foundation. It could provide a good faith basis, and that's where that foundation would be laid there as well. It did not do that in this case. It could also- I'm just kind of wondering practically how, because this is a little different than, you know, in civil cases where you're going to do expert discovery, and I'm not sure that was conducted here, and I imagine it wasn't, right, where you're going to have an expert who comes on the stand and starts making broad statements, and, you know, the government, I think, would argue, well, we should be able to show that the expert didn't consider certain facts. How are they supposed to do that in real time? I mean, I understand if they are asking about things that are untrue, right? You can't do that, and perhaps things that are uniquely prejudicial would have other evidentiary problems with that kind of question, but how do you see the government being able to effectively cross-examine if they can't do some of what's being alleged here? Here, Your Honor, the government is able to cross-examine and to impeach an expert properly. The problem is that they needed to either introduce this evidence, lay foundation, or they could have called their own expert. They can ask hypothetical questions that- about the testing that Dr. Sullivan did or what he relied upon, but here, these questions in particular, there is no record evidence that another expert would have relied upon this information or considered it when reaching his conclusions. There's also no evidence in the record that Dr. Sullivan relied on any of this information to reach his conclusions or would have considered it, and so for those reasons, it's improper, Your Honor, apart from it being facts, not an evidence. Okay. Thank you, Your Honor. Why don't we- we'll put three minutes for you up on the clock when you come back, and since we kept you going there, and we'll hear from Mr. Walkingshaw. Good morning. May it please the Court. Peter Walkingshaw on behalf of the United States. With the Court's permission, I'd like to begin with where Defendant's Counsel ended her argument regarding whether or not this is the sort of information that Dr. Sullivan might have used in his opinion, and I'd like to direct the Court to Dr. Sullivan's testimony that he used collateral information, which is information about Stoney Pryor's life and behavior outside the psychological testing situation to establish and buttress his findings, and he testified. He used an example of whether or not someone who had tested with low cognitive ability had done quite well in school. He said, if the collateral information is inconsistent with my findings, that would cause me to question my conclusions. It's very clear in this case that the expert opened the door to this kind of questioning. I'd like to follow up a little bit on Judge Bress's question from earlier as to whether and what's the government supposed to do here. The difficulty is twofold. One, in criminal cases, depositions are only given under extraordinary circumstances. She was permitted to do so with Dolores Abel in this case because she was on death's door, but it's ordinarily not the sort of thing that the government can conduct with a defense expert. It has to be done live, on the stand, at trial. There was no deposition of Dr. Sullivan? We couldn't do it, Your Honor. And unfortunately... Well, so what is the line here? Because we have cases that say, you know, you can't cross-examine defense experts with open the door. Where's the line here? Well, Your Honor, I believe in Stinson it was undisputed. The defense expert in that case was a warden who had supervised the prison where the defendants were allegedly operating the Aryan Brotherhood, and it was clear that his opinion was solely based on his time at the prison. There was really no suggestion whatsoever that his opinion could have been based on the sort of material that the government asked about in that case because it took place after the warden had stopped serving. In this case, the expert made it very clear that these sorts of information, information about what the defendant is like outside of the psychological testing scenario, would impact the way in which the expert would view his findings. And so it's difficult in part because in order for the government to lay a foundation for relevance of the underlying acts, it needs to ask the expert, would this have made a difference to you? And if the expert says no, that's proper impeachment. That's impeachment for what we call confirmation bias. It's a bias that is prominent in the social sciences, or examined in the social sciences, in which someone who has formed a conclusion will accept information that bolsters that conclusion, but will ignore or reject information, like the information here, that seems to be inconsistent with the conclusion previously reached. Now, the government and the courts offered a limiting instruction to the defense. It was, I believe, largely agreed that the limiting instruction would have been acceptable to everyone, but the limiting instruction was not requested at the time the questions were asked. Instead, the defense opted to strenuously object, but no request for the limiting instruction was made. But the government offered to have the jury instructed that the questions were offered solely for impeachment, which is the only value that they had given the responses that Dr. Sullivan gave in this case. These things would not have made a difference to me. I guess, in looking at the government's questioning of Dr. Sullivan, there are lots of ways to have set a foundation or generally probed the question of compliance. Ultimately, Dr. Sullivan's testimony was not about compliance with law enforcement. It was going to be compliance with this alleged third party. And in terms of the questions, there are more aggressive and less aggressive ways to do it. I think the district court backed off the most aggressive. But if you were to learn that the defendant had allegedly gotten up and smacked things off a table and speaking to agents in charge of an investigation, no foundation there for opening up, well, did you consider his interactions with law enforcement at all, in which case he could say no and then you would have been able to work with that. And that strikes me as close to testifying. Well, Your Honor, I believe had that question been asked and answered, there would have been no foundation for further inquiry into the area. And I do want to. Which question? Just the foundational question of, have you considered his interactions with law enforcement? If the answer is no, then a further question presumably could not be asked. I do want to make the point with respect to Your Honor's concern about the impact of some of these questions, I do want to emphasize that these are minimally prejudicial instances of other conduct. A question that was not objected to because the underlying facts were in the record was, would it make a difference to you if you learned that Stoney Pryor threatened to kill a witness? That was from the deposition testimony of Dolores Abel. It is in the record. It was not objected to. It was a perfectly proper question. The idea that Mr. Pryor, the jury believed that Mr. Pryor was more likely to commit a murder because he knocked some things off the table or he was noncompliant with with jail guards who are looking to search his cell. It's just implausible, Your Honor. And I think I guess the problem with that is my understanding is that is that any vouching or testifying by the prosecution as to facts, not an evidence. It's it's seems nearly to be a per se rule. So I'm not sure whether plain error or not is that issue changes changes that that there's even more prejudicial vouching going on that wasn't objected to. Well, Your Honor, I would say that the questions were posed in the hypothetical. So it was never asserted that the that the events actually happened. The question was, would it change your opinion if you were to learn that this is true? And with respect to the prejudicial effect or not, it's undisputed that the defendant needs to establish, assuming that this court finds error here, which, again, we would urge the court not to do. But if the court finds error, the defendant needs to establish that it more likely than not had a material effect on the verdict. And in this case, I think that simply can't happen for two reasons. First, the benign nature of the questions, which we've discussed at length, particularly when contrasted with the facts of the case itself and the allegation in evidence that Mr. Pryor threatened to kill one of the witnesses. Moreover, the the testimony of this expert was marginally relevant at best. The opinion that he offered was that generally Mr. Pryor was in the 75th percentile of the suggestibility, meaning one in four people are more suggestible than Mr. Pryor and that generally he is compliant in some situations, but not in others. Did you try to exclude that testimony altogether? We did not, Your Honor. And, you know, I can't really I would say that it's it is marginally relevant and the defendant is entitled to a defense. But once that defense is put on, it's more than fair to evaluate the actual strength of what's being said. And again, there is no evidence whatsoever that Stoney Pryor and Kim Abel, the object of the accusation that she had masterminded a story in which he would take the fall for it. There's no evidence that they were in a relationship. Beau Crutcher, her partner, was asked on the stand if he thought that they were. He said he did not know. There is no evidence that Kim Abel was present at the time the murders occurred. There is no evidence that she committed. There is no evidence whatsoever that she made any suggestion of any kind to Stoney Pryor that he needed to take the fall for the for the murders that he so plainly committed. I'd refer the court to this to its model jury instruction on reasonable doubt. Reasonable doubt is based on common sense, but it is not based purely on speculation. And while the defense is certainly entitled to present essentially whatever defense it can in this case, there is no evidence of any kind that Kim Abel was responsible for the murders or influenced Mr. Pryor in how to go about discussing them in any way. The expert opinion here solely went to the general proposition that he is somewhat but not extremely suggestible and that he's compliant in some situations, but not in others. It's purely an assessment of his personality. Generally, we want to address the jury instruction issue. Certainly, Your Honor. I think it's worth noting in this case that the defense was allowed to argue at length at closing that its theory of the defense third party culpability was inconsistent with the government proving its case beyond a reasonable doubt. There's no question that the jury was repeatedly instructed over and over, not only in the court's instruction itself, but during the course of the prosecution's closing, that the government bore the burden of proving the elements of the crime beyond a reasonable doubt. This is not a case which I think would be more appropriate for us to be having a discussion in which the defendant put forward an affirmative defense, entrapment, duress, something like that, in which the elements might be proved, but the defendant's culpability might be diminished or eliminated by facts beyond proving the elements of the crime. But here, it's very plain that any jury with common sense would understand that if someone else committed the murders, a third party, or if there was a reasonable doubt that someone else committed these murders, that the government had failed to prove its case. The two things are, it's the, the, the, uh, I beg your pardon, Your Honor, I didn't mean to cut you off. Yeah, well, I guess setting aside the affirmative defense scenario, is there any defense theory that a general reasonable doubt instruction wouldn't cover by this logic? Um, well, Your Honor, I mean, I think the test is whether or not the jury instructions fairly and adequately covered the issue. So it's difficult for me to come up with an answer that would, um, you know, necessarily cover every situation. But I can't think of one, Your Honor, if what the defense's case is, is, uh, I didn't do it, then that's a reasonable doubt case. Um, I mean, that it perhaps might not be an abuse of discretion for a district court to understand in some fashion or other. Um, but this is simply an allegation that someone else committed these murders. I mean, it's, it's, it's hard to think of a more intuitive and simple defense. What was your, what was the government's objection to allowing the third party guilt instruction? I think, Your Honor, it's a common instruction, right? But it's not always given, Your Honor. And some, I mean, uh, no, we didn't cite them. Um, it was simply unnecessary here. It would place an undue focus on, um, on an area that was, again, plainly covered by the reasonable doubt instruction. The jury did not need to have it further explained to them, uh, why a third person committing the murders, a third party committing the murders would have established reasonable doubt. Um, simply unnecessary. Would it have been an abuse of discretion for the district court to give it? Perhaps not. Um, but that doesn't mean it was necessary and certainly not reversible error. For the district court to give an instruction that plainly covers the defense theory, the reasonable doubt instruction. It does seem, I mean, I'm kind of have a similar reaction to Judge Johnson. And, um, it just seemed, it does seem that the implication of your argument is that if your theory of defense is third party guilt, a reasonable doubt instruction is, is, is basically never going to be error not to give this third party guilt instruction absent some pretty unusual circumstance where maybe you were prevented from putting on evidence or there was some other reason to think, but, but in the, in the mind running cases and perhaps basically all of them, this is if it's error, it's never going to be harmful. Uh, I mean, I think that might be true, Your Honor, but I don't see an issue with that. Again, it is such an intuitive defense that the question is does the jury require instruction on the issue? And I think, again, the idea that a third person, a third party committed the crime and not the defendant, that's, I mean, essentially, I think that's in some respects the most, the most basic kind of defense a jury could possibly grasp. And so while it's possible, I don't want to say that there are no circumstances whatsoever where a third party defense instruction might be necessary. Um, this is clearly not a case in which it was. Can you address the closing argument issue? Uh, certainly, Your Honor. So I believe there were, there were two objections. Um, I don't know if you're, Your Honor had one in particular in mind. Uh, I'd rather hear from you on both. All right. Um, so with respect to the discussion of, um, the, uh, the, the victims deserving justice, uh, defendant concedes on page 32 of, uh, it's brief that these comments need to be assessed in terms of whether or not they're a reasonable response to something set in defense closing. And I think here it's very clear that the, uh, argument that the victims deserve justice despite their level of intoxication at the time of their murder was a fair response to comments by defense counsel on pages 1310 and 1311 of the record. I read a few of them now, but I'll try and do so quickly. Um, do you remember what the BAC of Amy Hinckley was to 10? Do you remember the blood count for the marijuana that was in her system? It was off the charts more than 14 nanograms per milliliter without question and almost unfathomable amount of marijuana in her system. Um, next Adeline, there was a very large Mason jar. It appears to be filled to the brim with vodka, maybe a soda kind of floater. Adeline is keeping the party going. It's all in the defense closing. Yes. So your honor, I think this is a more than fair response to comments by defense counsel that could reasonably interpreted to prejudice the jury against the victims by virtue of the fact that they were intoxicated or partying at the time of their death, um, with respect to, um, the, the government's comments regarding, um, uh, the duty as jurors that immediately followed an exhortation. Follow the law, follow the evidence. I believe something like three pages prior in, in the transcript, the government reminded the jury that it bore the burden of proving its case beyond a reasonable doubt, and it concluded find him guilty because that's what he did not find him guilty because it's your duty. Although in this court's reasonable doubt instruction in the, in the model jury instructions, it does tell the jurors that it is their duty to find the defendant guilty if the government meets his burden, which is what happened here. But I, I don't think it's a reasonable reading of what the prosecutor said in this case, that the jury should find the defendant guilty merely because it's, that's their duty. And again, uh, juries are afforded some, a modicum of common sense when, um, when interpreting, uh, you know, how, how they take in closing arguments. Okay. I think we've let you go a little bit over and I not hearing further questions. So I want to thank you, Mr. Walking shop for your presentation this morning and we'll hear rebuttal. Appreciate the time. Thank you, your honors. I'll try to be brief. Um, and going in order of the government's argument. So first, um, as to Dr. Sullivan, this, uh, collateral information that the government is referencing here, the only thing that gov that Dr. Sullivan reviewed, uh, prior to the testing, there was a 30 minute interview done with, uh, Mr.  Could Mr. Prior, uh, establish a baseline? Could Mr. Prior speak, um, you know, what did he have any drug use, a sort of brain trauma? Um, and any other, could he remember personal information, things of that nature, the government also conceded in its closings that Dr. Sullivan's findings were 100% based on the tests that he took. And so, um, we would submit that the collateral information about life and behavior does not change this issue. Um, this still was an error because, uh, the government crossed the expert with facts that were not in evidence here, which is contrary to Stinson. Um, I would also just know for the court that the request for the curative instruction was made at ER 62. Um, although the government represents that there was none made, uh, as to the third party defense instruction. Can you just clarify that, that the, I thought the government, I may be misspeaking here, but I thought the government said there was this discussion about a curative instruction and it wasn't given at a certain time. What's your position on how this all was sequenced? So there was a sidebar, um, that with the parties and the court, uh, that discussed sort of these, these improper, um, this information the government wanted to, to, uh, cross Dr. Sullivan on, um, the parties went back and forth on what a curative instruction would look like. Um, one was requested by defense. Then the court permitted these hypotheticals to be, uh, asked. I would say that these weren't exactly hypotheticals, um, the way these were characterized. Uh, but, uh, then after that defense continued to contemporaneously object, um, by my count five times throughout the improper cross examination. Right. But did they ask for the curative instruction to be given later or? There was not a renewed request. Okay. Mr. Tory, could you just respond to the, uh, government statement and the argument that, that there was no evidence of suggestion by the third party that basically that, uh, when we look at least at the harmless error, that, um, there wasn't enough of a defense there for any of these areas to be harmful. Uh, we disagree with that. Your honor here, uh, Dr. Sullivan testified that, uh, Mr. Pryor was in the second percentile for people in his IQ. I'm sorry, outside of Dr. Sullivan's testimony, what evidence was there that a third party could have committed this? Here, uh, the evidence showed that, uh, Kim was the individual who owned the murder weapon. She hid the murder weapon on her property. She was the one that was driving Mr. Pryor around that evening and then was heard with him later into the early hours of the morning. Um, she lied to police, um, after she'd been questioned by them multiple times, they'd interviewed her. Was there, was there any evidence placing her at the home where the murders took place? No, but I would also note that there was no trace evidence found on Mr. Pryor. Um, and, uh, right. But there were his confessions. There were his confessions, your honor, which we argue, um, were not corroborated. Was there any foundation outside of Dr. Sullivan's testimony, um, that, uh, the third party, uh, had suggested or had a habit would have suggested we have evidence that Mr. Pryor might be open to suggestion, but what was the evidence that, um, that there could have been a suggestion from the third party? Um, here there, the, there was evidence that Kim, um, had time together that evening. Um, uh, there was some evidence about maybe jealousy because of a potential relationship between, um, uh, Mr. Pryor and, and, and the victims. However, that, um, I don't think that was, uh, specifically, uh, established, um, but that was presented to the jury as a theory. Uh, but even so your honor, the, the problem here, at least with the prosecutorial misconduct for the crossing is that Mr. Pryor couldn't call Kim, um, to testify. And so the best evidence that he had to present as to why he might falsely confess was through Dr. Sullivan. And so this evident or the, these, uh, improper questions that were provided by the government, um, that undercut and, and really cut to the credibility of Dr. Sullivan were highly prejudicial. And also for the reason that your honor pointed out previously, which was that the jury might think that he has a propensity for violence, um, or, or aggression. Um, I wanted to also very quickly address the, uh, closing error. Oh no, I'm sorry, your honors. I forgot the, um, for the third party instruction. This is a unique situation because it's, it's not a defense to, um, it's not a defense to necessarily one of the elements. It's not as if Mr. Pryor is arguing that he didn't have the requisite intent here. That would be different. I think when we look at the reasonable doubt instruction here, we're talking about separate evidence that someone else is responsible. Um, and the jury here needed an instruction to explain to them what the framework was once, uh, Mr. Pryor put on that evidence and what, what the burden was for both parties, once that was placed in evidence, that's what's missing from these jury instructions. As to the, uh, closing, uh, improper statements, um, for two reasons, uh, we meet plain error, the, the statements that were made in closing inflamed the jurors passions and mischaracterized the jury's duty. Um, here, the, the statements that inflamed the jurors passions would have led the jury to, or essentially the message was the only way for the, for the victims to receive justice was to convict Mr. Pryor because Kim couldn't be brought to justice. That is improper. Um, and mischaracterizing the jury's duty. United States versus Sanchez is very clear. The, um, role of the jury is to determine if the government has carried its burden of proof, not to find Mr. Pryor guilty unless the court has any other questions. Thank you. Miss Torrey appears not. I want to thank you. And I want to thank Mr. Walkinshaw for your presentations and arguments this morning. This case is submitted.
judges: BRESS, JOHNSTONE, Moskowitz